UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FREDERICK J.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03515-TWP-DLP |
| | ) | |
| ANDREW M. SAUL, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Frederick J. challenges the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits under Title II of the Social Security Act. *See* 42 U.S.C. § 423(d). Frederick seeks reversal and remand of that decision. (Dkts. 1, 7).

On April 10, 2020, United States District Judge Tanya Walton Pratt entered an Order referring this matter to the Undersigned for a report and recommendation regarding the appropriate disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 14). For the reasons set forth below, the Undersigned recommends that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings.

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

## I.    PROCEDURAL HISTORY

On February 29, 2016, Frederick filed his application for Title II Disability Insurance Benefits ("DIB"). (Dkt. 5-5 at 2, R. 175). Frederick alleged disability resulting from degenerative disc disease, arthritis in the lower thoracic and upper lumbar areas, bulging discs at multiple levels, depression, anxiety, bilateral inguinal hernias, narrowing of the spine, spondylolysis/pars defect, and severe sleep apnea. (Dkt. 5-6 at 6, R. 200). The Social Security Administration ("SSA") denied Frederick's claim initially on May 17, 2016. (Dkt. 5-4 at 2, R. 108), and on reconsideration on August 12, 2016. (Id. at 9, R. 115). On September 21, 2016, Frederick filed a written request for a hearing, which was granted. (Id. at 17, R. 123).

On April 19, 2018, Frederick, represented by counsel, testified at a hearing before Administrative Law Judge ("ALJ") Kevin Walker. (Dkt. 5-2 at 55-79, R. 54-78). The ALJ also heard testimony from Dr. Roxane Minkus, a vocational expert. (Id. at 79-85, R. 78-84). On August 16, 2018, ALJ Walker denied Plaintiff's request for benefits. (Id. at 9-30, R. 8-29). On August 21, 2018, Frederick appealed the ALJ's decision. (Dkt. 5-4 at 67, R. 173). On June 25, 2019, the Appeals Council denied Frederick's request for review, making the ALJ's decision final. (Dkt. 5-2 at 2-5, R. 1-4). Frederick now seeks judicial review of the ALJ's decision denying benefits. *See* 42 U.S.C. § 1383(c)(3).

## II.    DISABILITY STANDARD

Under the Act, a claimant may be entitled to DIB only after he establishes that he is disabled. To prove disability, a claimant must show he is unable to "engage

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a). The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [him] unable to perform [his] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then he must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R.

§ 404.1520. (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id*. at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform his own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(iv).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id*. The Commissioner must then establish that the claimant – in light of his age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

### III.   STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the Commissioner's final decision. 42 U.S.C. § 405(g). In reviewing this decision, the question before the Court is not whether the claimant is in fact disabled, but whether the Commissioner's

decision to deny benefits is supported by substantial evidence. *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Frederick is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy*, 705 F.3d at 636 (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v.*

5

*Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

## IV. BACKGROUND

### A. Frederick's Relevant Medical History[2]

On February 2, 2016, Frederick visited Dr. Mark Lamb at American Health Network in Avon, Indiana with complaints of groin pain affecting his ability to walk. (Dkt. 5-7 at 11, R. 275). During the physical examination, Dr. Lamb noted that Frederick's back and spine were negative for posterior tenderness; he had normal flexion, extension, and rotation; and had a negative straight leg raise test in supine position. (Id. at 12, R. 276). Dr. Lamb's assessments included midline low back pain without sciatica and acute flank pain on the left side and in the pelvic area. (Id. at 13, R. 277). Dr. Lamb prescribed Toradol and Norco (Hydrocodone) to address

---

[2] Plaintiff primarily challenges findings related to his physical back impairments. As such, the Undersigned will focus on a review of Frederick's back related medical history.

Frederick's midline low back pain. (Id). Dr. Lamb opined that Frederick's flank pain could be a kidney stone and that if the pain worsens, a CT scan should be conducted. (Id).

On February 5, 2016, Frederick visited Nurse Practitioner ("NP") Molly Spearing at American Health Network for a follow-up appointment to address his back and groin pain. (Dkt. 5-7 at 7, R. 271). Frederick's physical examination revealed tenderness on his back and spine, decreased thoracic and lumbar mobility; positive posterior tenderness; paravertebral muscle spasms; left lumbosacral tenderness; and decreased range of motion with the lumbosacral spine. (Id. at 9, R. 273). NP Spearing assessed Frederick for spondylolysis in the lumbosacral region and bilateral inguinal hernias, and planned an MRI of the lumbosacral spine. (Id). NP Spearing recommended that Frederick apply moist heat or an ice pack, as needed, and prescribed a Medrol dose pack, Zanaflex, and Neurontin. (Id).

On February 5, 2016, Dr. Thomas G. Belt performed an x-ray of Frederick's lumbar spine at American Health Network. (Dkt. 5-7 at 5, R. 269). NP Spearing noted mild narrowing at L2-L3 and L5 to S1; mild "jutting forward" at L2-L3 without change with movement; and findings of mild arthritis off the vertebral bodies. (Id). Based on these findings, NP Spearing noted that it was appropriate to proceed with an MRI. (Id).

On February 9, 2016, Frederick underwent an MRI of his lumbar spine at American Health Network. (Dkt. 5-7 at 3, R. 267). Upon comparison with Frederick's July 2009 MRI, Dr. Mary E. Below found a mild retrolisthesis of L2-L3 and L3-L4

which had slightly worsened with some progression of disc space narrowing; slight retrolisthesis of L4 on L5; a pars defect at L5; a central disc extrusion with spurring at T11-T12; lateral recess narrowing and central stenosis at L2-L3 and L3-L4; and bulging discs at several levels of the foramen. (Id. at 4, R. 268). From the MRI, NP Spearing noted that Frederick had bulging discs at multiple levels which had progressed since his previous MRI; arthritis in the lower thoracic and upper lumbar areas with progressed bulging discs at L2-L3 and L3-L4, and assessed that this was "likely were (sic) a lot of [Frederick's] pain [was] coming from." (Id). NP Spearing opined that this pain would be "amendable (sic) to injection," referred Frederick to Dr. Doran, and recommended physical therapy. (Id). Given the multi-level nature of Frederick's back pain and the lack of neurological deficit, NP Spearing did not refer Frederick for surgery. (Id).

On February 17, 2016, Frederick attended a physical therapy session at Fast Track Physical Therapy in Avon, Indiana. (Dkt. 5-7 at 37, R. 301). Physical Therapist Matthew Barton examined Frederick for low back pain and lumbago with sciatica on his left side. (Id). During the session, Frederick explained that since 2008 he had experienced chronic lower back pain, which had worsened in the last three weeks and was aggravated by walking, bending, twisting, and lifting, but eased with ice and rest. (Id). Frederick also explained that he had received physical therapy in the past with some relief. (Id). When assessing Frederick's range of motion, Mr. Barton noted that he had moderate loss with his ability to bend forward and severe loss when attempting to bend backwards. (Id). Mr. Barton assessed Frederick with

intermittent left sciatic type symptoms; diminished deep tendon reflexes on his left patellar reflex, and poor tolerance to all examination procedures. (Id. at 38, R. 302). Finding good rehabilitation potential, Mr. Barton developed short-term goals for Frederick, including compliance with a home exercise plan, therapeutic exercises, therapeutic activity, gait training, neuromuscular rehabilitation, and manual therapy to improve pain relief. (Id. at 38-39, R. 302-03). In qualifying Frederick's lower back pain utilizing the Oswestry Disability Index, Mr. Barton projected that Frederick would experience full, pain free lumbar flexion within eight weeks of therapy. (Id).

On February 23, 2016, Frederick attended a consultation appointment with Dr. Christopher Doran of Goodman Campbell Brain and Spine Interventional Pain Management Center to address his back, left groin, and hip pain. (Dkt. 5-7 at 18, R. 282). During the appointment, Frederick explained that he began experiencing new, left upper lumbar pain about three to four weeks ago which had prevented him from working as a welder. (Id). Frederick described an increase in his left-sided lumbosacral pain "coming around into the left buttock and hip." (Id). Lifting and climbing stairs, Dr. Doran noted, sometimes produced a pinch, tingling, and pain into Frederick's leg. (Id). Dr. Doran conducted a diagnostic review, comparing Frederick's 2009 MRI to his February 2016 lumbar MRI. (Id). Dr. Doran's review revealed worsening disc degeneration and central disc extrusion at L2-L3 and L3-L4 causing severe lateral recess narrowing; worsening lateral recess narrowing at L5-S1; and continued mild to moderate foraminal narrowing greater on the left than

right. (Id). Dr. Doran assessed Frederick for lumbar radiculopathy with a plan to offer left L3 and L5 selective injections and to begin physical therapy after the injections. (Id. at 18-19, R. 282-83). Dr. Doran further noted that with the amount of degeneration in Frederick's back, he would need to "really push the core strengthening" if he wishes to return to work. (Id. at 19, R. 283). Dr. Doran recommended that Frederick use a lifting or work belt to reduce back pressure. (Id). On February 29, 2016, Dr. Doran performed a left L3 and L5 selective nerve root injection for "diagnostic and therapeutic benefit." (Id. at 80, R. 344). Immediately following the injection, Frederick experienced an improvement in his pain, from 8/10 pre-procedure to 6/10 post-procedure, in his lower back and a complete alleviation of pain in his lower extremity. (Id).

On March 30, 2016, Frederick attended a follow-up appointment at Goodman Campbell Brain and Spine. (Dkt. 5-7 at 73, R. 337). Frederick reported "no significant benefit" from the injection and identified persistent back pain and intermittent left lower extremity pain, but no groin pain. (Id). Dr. Doran assessed Frederick with lumbosacral spondylosis without myelopathy. (Id). Dr. Doran noted that Frederick's recent MRI results revealed central disc extrusions at L2-L3 and L3-L4 causing severe lateral recess narrowing; mild to moderate foraminal narrowing greater on the left than right at L5-S1; and multilevel facet arthropathy. (Id). Dr. Doran recommended medial branch blocks at bilateral L4-L5 and L5-S1 to

determine what was causing Frederick back pain and whether he was a candidate for a rhizotomy[3]. (Id. at 75, R. 339).

On April 29, 2016, Frederick visited Dr. Nicole Sawada of Meridian Diagnostic for a consultative disability evaluation on behalf of the SSA. (Dkt. 5-7 at 55, R. 319). Dr. Sawada's examination of Frederick's cervical spine revealed no tenderness in the spinous processes; no paravertebral muscle spasms or tenderness; normal cervical spine flexion to 50 degrees and normal extension to 60 degrees; normal lateral bending to 45 degrees bilaterally and rotation to 80 degrees bilaterally. (Id. at 57, R. 321). Dr. Sawada's examination of Frederick's dorsolumbar spine showed no apparent kyphosis or scoliosis; no paravertebral muscle spasms or tenderness to palpation of the spinous processes; normal forward flexion of the lumbosacral spine to 90 degrees; normal extension to 25 degrees and normal lateral bending to 25 degrees bilaterally; and negative straight leg raises in the supine position. (Id). Dr. Sawada's hip examination revealed no tenderness or atrophy; normal flexion to 100 degrees bilaterally and normal extension to 30 degrees; normal abduction to 40 degrees bilaterally and normal adduction to 30 degrees; internal rotation preserved to 40 degrees bilaterally and external rotation preserved to 50 degrees. (Id). Finally, Dr. Sawada noted that Frederick's gait was stable and within normal limits and he could walk on his bilateral heels and toes. (Id).

On April 30, 2016, visited a psychologist, Dr. Jared Outcalt, HSPP, on behalf of the SSA for a mental health consultative disability evaluation. (Dkt. 5-7 at 60, R.

---

[3] A rhizotomy is a surgical procedure to sever nerve roots in the spinal cord. *Rhizotomy*, https://www.spine-health.com/glossary/rhizotomy (last visited September 8, 2020).

324). Dr. Outcalt diagnosed Frederick with adjustment disorder with anxiety, opioid use disorder in sustained remission, and antisocial traits. (Id. at 66, R. 330).

On May 3, 2016, Dr. Shayne Small, a state agency physician, completed a Physical Residual Functional Capacity Assessment and found that Frederick had the following exertional limitations: occasionally lifting and/or carrying fifty pounds; frequently lifting and/or carrying twenty-five pounds; standing and/or walking about six hours in an eight hour workday; sitting for a total of six hours in an eight hour workday, and pushing and/or pulling for an unlimited time. (Dkt. 5-3 at 8, R. 92). Dr. Small found that Frederick had no postural, manipulative, visual, communicative, or environmental limitations. (Id). Dr. Small determined that Frederick was not disabled and had the ability to adjust to other work. (Id. at 9-10, R. 93-94).

On June 22, 2016, Frederick visited Dr. Doran at Goodman Campbell Brain and Spine with complaints of lower back pain. (Dkt. 5-7 at 71, R. 335). Dr. Doran diagnosed Frederick with lumbar spondylosis and performed a lumbar facet joint block procedure targeting L4-L5 and L5-S1 bilaterally to determine if Frederick's "facet joints are, in fact, his primary pain generators." (Id). Dr. Doran further noted that the injections were performed in an area with no prior spinal fusion surgery, and for pain that had failed to respond for more than three months with conservative management. (Id). Dr. Doran noted that Frederick tolerated the procedure well and experienced a greater than 60% reduction in his pain immediately following the injection. (Id).

On July 5, 2016, Frederick visited American Health Network for an office visit to address dizziness, hypertension, back pain, and shoulder pain. (Dkt. 5-10 at 43, R. 539). Frederick explained that he was continuing to experience back pain, and that he was scheduled for his second round of injections with Dr. Doran the following day. (Id). Frederick also commented that he was experiencing moderate pain in his right shoulder. (Id. at 44, R. 540). NP Spearing scheduled an x-ray to assess Frederick's right shoulder. (Id. at 46, R. 542).

On July 6, 2016, Frederick visited Dr. Doran at Goodman Campbell Brain and Spine for a diagnostic procedure of lumbar facet joint blocks targeting L4-L5 and L5-S1 bilaterally. (Dkt. 5-8 at 71, R. 421). Dr. Doran diagnosed Frederick with lumbar spondylosis and noted that he would need to see an improved response with the joint blocks before proceeding with a rhizotomy. (Id). Frederick tolerated the procedure well and his pain level improved from 8/10 pre-procedure to 5/10 post-procedure, which Dr. Doran noted was almost a 40% reduction in pain. (Id).

On July 19, 2016, Frederick presented to American Health Network for a steroid injection in his right shoulder to address pain with movement and difficulty sleeping on the right side. (Dkt. 5-10 at 38, R. 534). NP Spearing noted that Frederick tolerated the procedure well, and if his symptoms failed to improve, Frederick should undergo an MRI or be referred to Dr. Brian Badman. (Id. at 41, R. 537).

On August 11, 2016, Dr. Mangala Hasanadka, a state agency physician, completed a Physical Residual Functional Capacity Assessment at the

reconsideration level. (Dkt. 5-3 at 12, R. 96). Dr. Hasanadka adjusted Frederick's exertional limitations and found that he could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight hour workday; sit for a total of six hours in an eight hour workday; and push and/or pull for an unlimited time. (Id. at 19, R. 103). Dr. Hasanadka identified postural limitations of occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; and occasionally balancing, stooping, kneeling, crouching, and crawling. (Id. at 19-20, R. 103-04). Dr. Hasanadka found no manipulative, visual, communicative, or environmental limitations. (Id. at 19, R. 103). Dr. Hasanadka determined that Frederick was not disabled and had the ability to adjust to other work. (Id. at 20-21, R. 104-05).

On October 9, 2016, Frederick visited NP Spearing at American Health Network with complaints of shoulder and groin pain. (Dkt. 5-10 at 25, R. 521). During the appointment, Frederick expressed moderate, aching, burning, and throbbing right shoulder pain that was aggravated by lifting, movement, and pushing, but relieved by rest. (Id). Frederick reported that he could no longer sleep on his right side because of the pain. (Id). In regard to his groin, Frederick explained that he had experienced a sharp and sudden pain in his right groin area when bending over in the shower a week prior to the visit, but the problem seemed to resolve on its own in ten minutes. (Id). NP Spearing ordered an MRI of Frederick's shoulder. (Id. at 29, R. 525).

14

On November 1, 2016, Frederick visited Dr. Doran at Goodman Campbell Brain and Spine. Dr. Doran noted that Frederick had responded "nicely to selective nerve root injections," but that he continued to complain of persistent low back pain in the lumbosacral area that "did not respond to an epidural or two rounds of medial branch blocks." (Dkt. 5-8 at 70, R. 420). Dr. Doran assessed Frederick with lumbosacral spondylosis without myelopathy and prescribed Lyrica to see if it would alleviate Frederick's symptoms. (Id).

On November 30, 2016, Frederick went in for a one-month follow-up visit with Dr. Doran at Goodman Campbell Brain and Spine. (Dkt. 5-8 at 70, R. 420). Frederick explained that he had discontinued taking the Lyrcia because it did not provide him with any pain relief and it caused his hands and feet to swell. (Id. at 67, R. 417). Frederick reported the same lower back pain and explained that past injections, Icy Hot patches, and Gabapentin had not helped alleviate the pain, but that the use of a TENS (transcutaneous electrical nerve stimulation) unit provided temporary relief. (Id). Dr. Doran assessed Frederick with bilateral low back pain without sciatica. (Id. at 68, R. 418). Noting that Frederick had tried other therapies, steroid injections and facet injections, but had not received any relief, Dr. Doran explained to Frederick that there were no additional interventional treatment options available, and recommended that Frederick follow up with his primary care physician and consider medical pain management treatment. (Id. at 68-70, R. 418-20).

On April 12, 2017, Frederick underwent an MRI of his cervical spine at ProScan Imaging of Fishers. (Dkt. 5-13 at 21, R. 763). Dr. David O. Griffith's

conclusions included a left paracentral disc protrusion at the C5-C6 level with foraminal extension resulting in moderate central canal and left foraminal narrowing compressing the exiting C6 nerve root in combination with facet arthropathy; reversal of the normal cervical lordosis centered at the C5-C6 level; and biforaminal narrowing at the C6-C7 level compressing the exiting C7 nerve root in combination with facet arthropathy. (Id. at 22, R. 764).

On November 30, 2017, Frederick presented to American Health Network for an office visit to address his back pain, fatigue, bipolar disorder, insomnia, and depression. (Dkt. 5-10 at 9, R. 505). Frederick expressed issues with sleeping and fatigue due to back pain. (Id). NP Spearing assessed Frederick with lumbosacral spondylosis without myelopathy or radiculopathy, reviewed his medical records and noted that injections had not helped; surgery in 2010[4] was not an option; and that Frederick was awaiting a disability hearing and determination. (Id. at 15, R. 511). NP Spearing did not provide details regarding a plan to address Frederick's back pain.

On March 6, 2018, NP Spearing completed a Physical Residual Functional Capacity Questionnaire. (Dkt. 5-13 at 8, R. 750). NP Spearing noted that she had been treating Frederick since 2008 to address his lumbosacral spondylosis, bipolar depression, insomnia, and right shoulder rotator cuff . . . and cervical degenerative

---

[4] On February 3, 2009, Frederick visited Nurse Practitioner Monica Hauger at American Health Network for an office visit to address left sided lumbar back pain with inferior back radiation and some left leg tingling. (Dkt. 5-11 at 79, R. 633). During the visit, Frederick noted he previously underwent injections and that Dr. Sabitino recommended surgery. (Id). Frederick stated that he was "unable to take off work to have back surgery." (Id).

disc disease diagnoses. (Id). NP Spearing described Frederick's prognosis as poor; described his symptoms of debilitating low back pain, chronic fatigue, poor sleep, depressed as chronic; characterized his low back pain as frequent, daily, continuous, ongoing with the precipitating factor being years of heavy lifting. (Id. at 8, R. 750). NP Spearing further noted Frederick's failed injections for low back pain; that surgery was not an option; his "ongoing neuro (illegible) pain" that was not managed well, and that his pain medications affect[ed] his chronic fatigue. (Id).

NP Spearing indicated that Frederick's impairments have lasted or can be expected to last at least twelve months; his impairments were reasonably consistent with the symptoms and functional limitations described in her evaluation; and that he was incapable of even "low stress" jobs because of constant pain. (Id. at 9, R. 751). NP Spearing indicated that Frederick, if placed in competitive work situations, could walk one city block without rest or severe pain; could sit for thirty to forty-five minutes before needing to get up; could stand for fifteen minutes before needing to sit down or walk; could sit, stand, or walk for less than two hours in an eight hour workday; would need periods of walking every ten minutes during an eight hour workday for two to three minutes each period; could rarely lift and carry ten or less pounds and never lift and carry more than twenty pounds; could occasionally look down, turn his head left or right, look up, and frequently hold his head in a static position; and could occasionally twist, but never stoop (bend), crouch, squat, climb ladders, balance, or climb stairs. (Id. at 9-11, R. 751-53). NP Spearing estimated that Frederick would likely be absent from work more than four days per month due to

his impairments. (Id. at 11, R. 753). Finally, addressing Frederick's environmental limitations, NP Spearing noted that Frederick should not be exposed to concentrated hazards such as from machinery or heights or fumes, odors, chemicals, or gases; less than moderate exposure to humidity and wetness; and unlimited exposure to temperature extremes, noise, dust, and vibration. (Id. at 12, R. 754).

### B. Factual Background

Frederick was forty-nine years old as of his alleged onset date of February 1, 2016. (Dkt. 5-6 at 2, R. 196). He has an eleventh-grade education. (Id. at 7, R. 201). He reported previous self-employment and relevant past work as a dock lead supervisor, laborer, warehouse worker, and welder. (Id. at 8, R. 202).

### C. ALJ Decision

In determining whether Frederick qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and concluded that Frederick was not disabled. (Dkt. 5-2 at 29, R. 28). At Step One, the ALJ found that Frederick had not engaged in substantial gainful activity since his alleged onset date of February 1, 2016. (Id. at 14, R. 13).

At Step Two, the ALJ found that Frederick's severe impairments included "degenerative disc disease, arthritis, rotator cuff tear status post right shoulder surgery, obstructive sleep apnea, diabetes, hyperlipidemia, bilateral inguinal hernias, and obesity," along with the non-severe impairments of hypertension, seizure-like activity, depression, anxiety, and post-traumatic stress disorder. (Dkt. 5-2 at 14, R. 13).

18

At Step Three, the ALJ considered relevant listings for shoulder impairments, back impairments, and mental impairments, and determined that Frederick did not meet or equal any listings. (Dkt. 5-2 at 18-19, R. 17-18). Next, the ALJ determined that Frederick had the residual functional capacity ("RFC") to "perform light work," as defined in 20 C.F.R. § 404.1567(b), with the following exceptions:

- Occasionally lifting and carrying twenty pounds;

- Frequently lifting and carrying ten pounds;

- Unlimited pushing and pulling except for the weights indicated;

- Standing or walking up to six hours in an eight-hour workday;

- Sitting for up to six hours in an eight-hour workday;

- Occasionally climbing ramps or stairs;

- Occasionally climbing ladders, ropes, or scaffolds;

- Occasionally balancing, stooping, kneeling, crouching, and crawling;

- Occasionally reaching overhead with the right upper extremity.

(Id. at 21, R. 20). The ALJ then determined, at Step Four, that Frederick could not perform his past relevant work as a warehouse worker, material handling supervisor, or welder. (Id. at 28, R. 27). At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Frederick's age, education, work experience, and residual functional capacity, Frederick is capable of adjusting to other work that exists in significant numbers in the national economy. (Id. at 29, R. 28). As such, the ALJ concluded that Frederick was not disabled. (Id.)

19

## V.    ANALYSIS

The Plaintiff challenges the ALJ's decision on four grounds. First, the Plaintiff argues that the ALJ erred in assessing whether his back impairment met or medically equaled a listing in the Listing of Impairments. Next, the Plaintiff challenges the ALJ's credibility determination. Additionally, Plaintiff argues that the ALJ did not properly weigh the opinion of NP Spearing. Finally, Plaintiff contends that the ALJ's RFC determination was unsupported. The Undersigned will consider each argument below.

### A. Listings Determination

Plaintiff argues that the ALJ failed to provide an explanation when evaluating whether his back impairments met or medically equaled Listings 1.04(A) or 1.04(C). (Dkt. 7 at 19). The Commissioner responds that the ALJ appropriately analyzed the medical records and articulated the requirements of Listing 1.04 that the Plaintiff failed to meet. (Dkt. 13 at 11). Thus, pursuant to SSR 17-2p, the Commissioner asserts, the ALJ appropriately articulated his reasons for not finding medical equivalence in his Step Three finding and RFC analysis. (Id. at 14).

Step Three asks an ALJ to consider whether an impairment, alone or in combination with other impairments, meets or medically equals a listed impairment, and is governed by Social Security Ruling ("SSR") 17-2p. SSR 17-2p, (S.S.A. Mar. 27, 2017, 2017 WL 3928306, at *1). SSR 17-2p was published with an effective date of March 27, 2017, which essentially replaced the analysis required by *Barnett v. Barnhart,* 381 F.3d 664 (7th Cir. 2004). The Court finds that SSR 17-2p is applicable

20

to the present case because the ALJ's decision was issued after the effective date of March 27, 2017. *See Russell G. v. Saul*, 1:18-cv-2785-DLP-TWP, 2019 WL 4409358, at *4 (S.D. Ind. Sept. 16, 2019).

To meet an impairment identified in the listings, a claimant must establish, with objective medical evidence, all of the criteria specified in the listing. *See* 20 C.F.R. § 404.1525; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). In the alternative, a claimant can establish "medical equivalence" in the absence of one or more of the findings if he has other findings related to the impairment or has a combination of impairments that "are at least of equal medical significance." *See* 20 C.F.R. § 404.1526(a)-(b). Equivalence is a medical judgment and requires expert medical opinion. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015); *see* 20 C.F.R. § 404.1526.

Frederick argues that the ALJ erred at Step Three in determining that he did not meet the requirements of Listing 1.04. (Dkt. 7 at 20). Specifically, the Plaintiff maintains that there is sufficient evidence in the record to demonstrate that he "could meet or at least equal Listing 1.04(A) or (C) for his back impairments." (Id). The Listing Impairment 1.04 provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is

21

> involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> . . .
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.04(A), (C).

In support of his argument, Plaintiff cites to medical evidence showing back tenderness; deceased thoracic and lumbar mobility; and decreased range of motion in the lumbosacral spine. (Dkt. 7 at 21; *see* Dkt. 5-7 at 9, R. 273). Further, Frederick notes that his February 9, 2016 lumbar MRI revealed multi-level spondylosis with progression at certain levels and a pars defects on the right at L5. (Dkt. 7 at 21; *see* Dkt. 5-7 at 4, R. 268). During his February 17, 2016 physical therapy session, Frederick noted that he exhibited moderate range of motion loss with forward bending and severe loss with backward bending. (Dkt. 7 at 21; *see* Dkt. 5-7 at 37, R. 301). Further, Plaintiff points to Dr. Doran's examinations of Plaintiff, which revealed a slow but non-antalgic gait; pain with lumbar flexion at thirty degrees and extension at ten degrees; reduced sensation in the left lateral calf; and positive left-sided straight leg raise at about thirty degrees. (Dkt. 7 at 21; *see* Dkt. 5-7 at 82, R. 346).

Additionally, Plaintiff points to Dr. Griffith's April 12, 2016 cervical MRI findings of shallow central disc displacement, mild central canal stenosis, and mild facet arthropathy at C3-4; disc desiccation, shallow disc displacement, mild right

foraminal narrowing without nerve root effacement, mild facet arthropathy, and non-compressive anterior protrusion at C4-5; disc dessication with mild loss of intervertebral disc space height, mixed spondylotic protrusion eccentric to the left with moderate central canal stenosis and left foraminal narrowing compressing the exiting left C6 nerve root in combination with facet arthropathy, mild right foraminal narrowing, reversal of the normal cervical lordosis, and non-compressive anterior protrusion at C5-6. (Dkt. 7 at 21; *see* Dkt. 5-13 at 21-22, R. 763-64). Finally, Plaintiff points to the broad-based protrusion abutting the ventral epidural space and thecal sac eccentric to the left; moderate resultant central canal stenosis; biforaminal narrowing compression the exiting C7 nerve roots in combination with facet arthropathy; and non-compressive anterior protrusion. (Dkt. 5-7 at 22; *see* Dkt. 5-13 at 21-22, R. 763-64).

Missing from these records, however, is a finding of "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.04(A). To the contrary, Plaintiff's muscle strength was 5 out of 5 in February 2016 and in April 2016, and was described as "normal" through January 2018. (Dkt. 5-2 at 12-14, R. 22-24). Without providing evidence of motor loss resulting in atrophy and sensory or reflex loss, Frederick is unable to meet all the criteria of Listing 1.04(A). *Hall v, Berryhill*, 906 F.3d 640, 645 (7th Cir. 2018); *see also Ray v. Berryhill*, No. 1:16-cv-1853-WTL-MPB, 2017 WL 4003156, at *7 (S.D. Ind. Sep. 12, 2017) (Listing 1.04(A) not met

where evidence did not show atrophy with associated muscle weakness or muscle weakness).

In addition, the Plaintiff has failed to identify any medical evidence showing an "inability to ambulate effectively" as required to satisfy Listing 1.04(C). Instead, Dr. Doran noted that Frederick's gait was "full weight bearing with no assistive device." (Dkt. 5-2 at 13, R. 23). During her consultative physical examination of Frederick, Dr. Sawada described his gait as normal and noted his ability to "walk on bilateral heels and toes." (Dkt. 5-2 at 13, R. 23). The ALJ also mentioned the treatment notes from Hendricks Therapy that noted Frederick's steady gait between September 2016 through January 2018. (Dkt. 5-2 at 14, R. 24). Without evidence of motor loss or an inability to ambulate effectively, the Plaintiff is unable to demonstrate that he met the Listing 1.04(A) or (C) requirements.

Reviewing the opinion as a whole, the Court finds that the ALJ's listing analysis was supported by substantial evidence. *Imse v. Berryhill*, 752 F. App'x 358 (7th Cir. 2018) (ALJ is not required to discuss the listing analysis in only one section of the opinion). Throughout his opinion the ALJ discussed the findings of Frederick's February 5, 2016 x-ray, February 9, 2016 lumbar MRI, Dr. Doran's February 23, 2016 examination of Frederick, February 29, 2016 nerve root injection, and April 12, 2017 cervical MRI. The ALJ concluded that the objective medical evidence showed that Frederick had positive imaging in his cervical and lumbar spine, but that he demonstrated a normal gait and normal motor strength throughout the record. (Dkt. 5-2 at 25, R. 24). Further, the ALJ concluded that the objective medical evidence did

not support the claimant's alleged symptoms of pain and its limiting effects. (Id). The

ALJ also credited Dr. Hasanadka's opinion that Frederick's impairments did not

meet or medically equal a listing. (Id. at 27, R. 26). As required, the ALJ specifically

discussed Listing 1.04 and evidence favorable to the Plaintiff and explained his

conclusion that Listing 1.04 was not met.

Frederick also contends that the ALJ erred in his perfunctory discussion of

whether his back conditions medically equaled Listing 1.04(A) or 1.04(C). (Dkt. 7 at

20). SSR 17-2p provides guidance as to the ALJ's articulation requirements when

considering medical equivalence. The ruling states:

> If an adjudicator at the hearings or AC level believes that the
> evidence already received in the record does not reasonably
> support a finding that the individual's impairment(s) medically
> equals a listed impairment, the adjudicator is not required to
> articulate specific evidence supporting his or her finding that the
> individual's impairment(s) does not medically equal a listed
> impairment. Generally, a statement that the individual's
> impairment(s) does not medically equal a listed impairment
> constitutes sufficient articulation for this finding. An adjudicator's
> articulation of the reason(s) why the individual is or is not
> disabled at a later step in the sequential evaluation process will
> provide rationale that is sufficient for a subsequent reviewer or
> court to determine the basis for the finding about medical
> equivalence at step 3.

SSR 17-2p (S.S.A.) 2017 WL 3928306 at *4. In this case, the ALJ noted that the

record failed to establish that Frederick "had an impairment or combination of

impairments that [met] or medically equal[ed] the severity of one of the listed

impairments . . . . " (Dkt. 5-2 at 18, R. 17). As outlined above, the ALJ specifically

noted that both the medical evidence of record and the medical opinions in this case

supported the notion that no impairment or combination of impairments was severe

enough to medically equal the criteria of a listed impairment. Under the plain language of SSR 17-2p, the ALJ sufficiently articulated his conclusion that Frederick's impairments did not medically equal a listed impairment. Because he did not need to provide a detailed articulation of his conclusions at Step Three, the Undersigned recommends that the Court decline to remand on this issue.

### B. Credibility Determination

Next, Frederick argues that the ALJ did not properly evaluate his credibility as required by Social Security Ruling 16-3p. (Dkt. 7 at 26).  "In evaluating a claimant's credibility, the ALJ must comply with SSR 16-3p and articulate the reasons for the credibility determination." *Karen A.R. v. Saul*, No. 1:18-cv-2024-DLP-SEB, 2019 WL 3369283, at *5 (S.D. Ind. July 26, 2019). SSR 16-3p describes a two-step process for evaluating a claimant's subjective symptoms.[5] First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). Second, the ALJ must evaluate the intensity and persistence of a claimant's symptoms such as pain and determine the extent to which they limit his ability to perform work-related activities. *Id.* at *3-4.

A court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510

---

[5] SSR 16-3p became effective on March 28, 2016, (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *2, replacing SSR 96-7p, and requires an ALJ to assess a claimant's subjective symptoms rather than assessing his "credibility." By eliminating the term "credibility," the SSA makes clear that the "subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 2016 WL 1119029 at *1. The Seventh Circuit has explained that the "change in wording is meant to clarify that administrative law judges are not in the business of impeaching a claimant's character." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

(7th Cir. 2019) (internal quotation marks and citation omitted). An ALJ must justify his subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and build "an accurate and logical bridge between the evidence and the conclusion." *Villano,* 556 F.3d at 562. An ALJ's evaluation is "patently wrong" and subject to remand when the ALJ's finding lacks any explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

At the hearing, Frederick testified that his back prevents him from working. (Dkt. 5-2 at 68, R. 67). In discussing his treatment, he stated that he has received injections, undergone heat therapy, and participated in physical therapy, but none have alleviated his pain. (Id. at 71, R. 70). Frederick testified that when he bends over, he feels a jab at the bottom of his back which causes him to stiffen up until he stands. (Id). Frederick further testified that he takes Zanaflex, Tizanidine, Naprosyn, Cymbalta, and Suboxone which have helped his pain, (Dkt. 5-2 at 71-72, R. 70-71), and stated that, with medication, his pain level is "around a five or six" out of ten. (Id. at 74, R. 73).

When asked about his typical day, Frederick stated that he usually gets up between 9:30 a.m. to 10:00 a.m., gets an ice pack, and sits on the recliner to watch television, but must get up to walk around because his back gets stiff. (Dkt. 5-2 at 75, R. 74). Frederick testified that he will periodically use a heating pad and a TENS unit during the day. (Id). He does not cook due to his back pain and when he attends church, he brings a "donut pad thing" to sit on, can sit for about thirty minutes, and

occasionally stands up. (Id). Further, Frederick testified that he wears a back brace most of the time. (Id. at 77, R. 76).

When assessing a claimant's subjective symptom allegations, the ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, at *4. Although the Court will defer to an ALJ's subjective symptom finding that is not patently wrong, the ALJ must still adequately explain his subjective symptom evaluation "by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367. Without this discussion, the Court is unable to determine whether the ALJ reached his decision in a rational manner, logically based on his specific findings and the evidence in the record. *Murphy*, 759 F.3d at 816 (internal quotations omitted); *see also* SSR 16-3p, at *9.

After recognizing that Frederick's impairments could reasonably be expected to cause his alleged symptoms, the ALJ concluded that Frederick's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (Dkt. 5-2 at 27, R. 26). Frederick argues that the ALJ's analysis of his subjective symptoms was legally insufficient and warrants remand. (Dkt. 7 at 30). The Undersigned tends to agree.

28

Here, the ALJ recited considerable testimonial and objective medical evidence that satisfies the required subjective symptom analysis, (Dkt. 5-2 at 22-25, R. 21-24), but failed to explain any purported inconsistences between Frederick's subjective complaints and daily activities, and between the subjective complaints and the objective medical evidence. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ seems to suggest that he discounts Frederick's symptom statements because they are inconsistent with the objective medical evidence, but because the ALJ does not directly address this issue, the Undersigned can only guess at the ALJ's rationale. (*See* Dkt. 5-2 at 25, R. 24). The Seventh Circuit maintains, however, that an "ALJ may not discredit a claimant's testimony about [his] pain and limitations solely because there is no objective medical evidence supporting it." *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017) (citing *Villano*, 556 F.3d at 562; *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("Pain is always subjective in the sense of being experienced in the brain."). Instead, SSR 16-3p requires the ALJ must to consider other evidence, "including the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8.

After listing the Plaintiff's activities of daily living and the difficulties he faced when performing these activities, the ALJ concluded that the evidence regarding Frederick's daily activities was not "sufficient to establish that he [was] unable to function at the level [the ALJ] assessed." (Dkt. 5-2 at 27, R. 26). The ALJ provides no

further explanation, and the Undersigned is left to assume which of Frederick's daily activities were insufficient. The Seventh Circuit requires the ALJ to support his subjective symptom analysis "by discussing specific reasons supported by the record." *Pepper,* 712 F.3d at 367. The mere listing of a claimant's daily activities does not satisfy this requirement, nor does it establish that the claimant does not suffer disabling pain. *See Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("The ALJ should have explained any inconsistencies between [claimant's] activities of daily living and the medical evidence."); *Nelson v. Colvin*, No. 13 C 2902, 2016 WL 337143, at *6 (N.D. Ill. Jan. 27, 2016) ("The mere listing of daily activities does not establish that a claimant does not suffer disabling pain and is capable of engaging in substantial gainful employment.").

The ALJ did not explain how Frederick's ability to groom his hair, feed himself, drive, go out alone, and shop two or three times per month for about ten minutes was inconsistent with his claims of severe back pain. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) ("But the ALJ did not explain why doing these household chores was inconsistent with [claimant's] description of her pain and limited mobility. Nor is any inconsistency obvious, so the ALJ did not substantiate the finding that [claimant's] daily activities reveal any exaggeration of [claimant's] limitations."); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("An ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence."). Because the ALJ failed to discuss how Frederick's pain

30

symptoms were inconsistent with his daily activities, the Undersigned finds the ALJ's analysis of Frederick's daily activities to be erroneous.

Even though the ALJ recited some medical evidence that falls within the 20 C.F.R. § 404.1529(c)(3) factors, he failed to connect this evidence to his conclusion discounting Frederick's statements about the intensity, persistence, and limiting effects of his symptoms. While the ALJ is not required to mention every piece of evidence in his decision, he "must build a logical bridge" from the evidence to his conclusion. *Villano*, 556 F.3d at 562. Taken together, the ALJ's presumed rationale for discounting Frederick's symptom allegations focuses on objective medical evidence without any connection to his subjective symptom allegations. Due to the ALJ's failure to build a logical bridge from the evidence to his conclusion, the ALJ's 16-3p "credibility" analysis is not supported by substantial evidence and the Court should remand this matter for further proceedings.

## C. Treating Medical Provider

Next, Frederick argues that the ALJ failed to provide support for his decision to give no "particular weight" to NP Molly Spearing's Physical Residual Functional Capacity Questionnaire. (Dkt. 7 at 30). Frederick also asserts generally that the ALJ did not follow the SSA's guidance on weighing treating sources as articulated in 20 C.F.R. § 404.1527(c). (Id. at 31). The Commissioner argues that the ALJ reasonably considered NP Spearing's opinion under the applicable regulations and found it unsupported by the record. (Dkt. 13 at 20-21).

When making a disability determination, an ALJ utilizes all of the available evidence in an individual's case record. SSR 06-03p.[6] "This includes, but is not limited to objective medical evidence; other evidence from medical sources, including their opinions; statements by the individual and others about the impairment(s) and how it affects the individual's functioning; information from other 'non-medical sources . . . ' "[7] Social Security Ruling 06-03p distinguishes between "acceptable medical sources" and other health care providers because only "acceptable medical sources" can establish the existence of a medically determinable impairment, give medical opinions, or be considered treating sources. Nurse practitioners, such as NP Spearing, are considered "other medical sources," whose medical opinion may be used to provide "insight into the severity of the [individual's] impairment(s) and . . . [to demonstrate how the impairment] affects the individual's ability to function." SSR 06-03p; § 404.1527(d)(2); *Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010).

On March 6, 2018, NP Spearing completed a Physical Residual Functional Capacity Questionnaire detailing Frederick's treatment and the impact his insomnia, depression, shoulder rotator cuff tear, cervical spine degenerative disc disease, and lumbar spine spondylosis had on his functional limitations. (Dkt. 5-13 at 8-12, R. 750-754). In describing Frederick's treatment and the severity of his back impairment, NP Spearing stated that Frederick had daily, continuous, ongoing pain.

---

[6] This Social Security Ruling was rescinded but is still applicable to all claims filed prior to March 27, 2017.
[7] The term "medical sources" refers to both "acceptable medical sources" and other health care providers who are not "acceptable medical sources." SSR 06-03p.

(Id. at 8, R. 750). She further indicated that Frederick was intolerant to his medications and the side effects caused Frederick to experience chronic fatigue. (Id). NP Spearing noted that Frederick's pain symptoms would constantly interfere with his ability to complete simple work tasks or tolerate low stress jobs. (Id. at 9, R. 751). NP Spearing assessed that Frederick would incur more than four impairment-related absences from work per month. (Id. at 11, R. 753).

As an initial matter, the Commissioner is correct that SSR 06-03p does not recognize NP Spearing as an acceptable medical source such that her opinion is not entitled to controlling weight. The ALJ must still consider her opinion and properly determine the requisite weight to give it when assessing Frederick's functional capacity. *Lauer v. Apfel*, 169 F.3d 489, 494 (7th Cir. 1999) (affirming that reports from non-physicians are helpful when determining functional capacity); *see also* 20 C.F.R. § 404.1527(f)(1). In determining the degree of weight to afford to NP Spearing's opinion, the ALJ should have considered the examining relationship, treatment relationship, length of the treatment relationship, and the frequency of examination, supportability, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(f)(1); *see also* SSR 06-03p; *see Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1039 (N.D. Ind. 2010) (affirming that these factors represent basic principles that apply to the consideration of all opinions from medical sources, even those who are not "acceptable medical sources").

Here, the ALJ appears to have decided to give no "particular weight" to NP Spearing's opinion without considering any of these enumerated factors. Instead, the

ALJ concluded, without citing to any medical records or documents, that NP Spearing's opinion was "not supported by the claimant's other treatment records." (Dkt. 5-2 at 27, R. 26). Without discussing any of the factors contemplated in SSR 06-03p and § 404.1527, the Court is unable to determine whether the ALJ reasonably considered and evaluated NP Spearing's opinion, and whether the ALJ's conclusion is supported by substantial evidence. The Undersigned recommends remand to allow the ALJ to re-evaluate the opinion of NP Spearing in light of all of the relevant evidence in the record. If the ALJ decides that NP's Spearing's opinion should be discounted, he must provide "good reasons" that are supported by substantial evidence. Without articulating such "good reasons," the ALJ has failed to build a logical bridge from the evidence to his conclusion.

### D. RFC Determination

Finally, Frederick lodges two challenges to the ALJ's Step Four RFC determination. First, Frederick claims that the ALJ failed to articulate the reasoning behind his RFC determination. (Dkt. 7 at 32). Second, because the ALJ used the unsupported RFC in the hypothetical posed to the vocational expert, Plaintiff asserts, the hypothetical was fundamentally flawed. (Id. at 34). The Commissioner argues that in determining the Plaintiff's RFC, the ALJ provided a sufficient narrative discussion to support his decision as required by SSR 96-8p. (Dkt. 13 at 23).

When determining Frederick's RFC at Step Four, the ALJ was required to conduct a function-by-function administrative assessment of what work-related

activities Frederick could perform despite his limitations. *Young*, 362 F.3d at 1000-01. The RFC is assessed based on all relevant evidence in the record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). This relevant evidence includes medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. SSR 96-8p, 1996 WL 374184 *5 (July 2, 1996).

Both the hypothetical posed to the vocational expert and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (citing *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014). When a vocational expert provides testimony in response to a hypothetical question that accurately describes the claimant in all significant relevant respects, that testimony provides substantial evidence to support an ALJ's findings about the claimant's work abilities. *Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011).

Here, the ALJ presented two hypothetical questions to the vocational expert. First, the ALJ asked the vocational expert:

> [A]ssume a hypothetical individual the claimant's age and education with the past jobs that you've described. Let's further assume this individual is limited to occasionally lift and carry twenty pounds, frequently lift and carry ten pounds; push/pull unlimited except for the weights indicated; stand or walk for up to six hours in an eight hour workday; stand or walk for up to six

35

> hours in an eight hour workday; sit for up to six hours in an eight-hour workday; occasional climbing of ramps or stairs; occasional climbing of ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling. On the right upper extremity, occasional overhead reaching.

(Dkt. 5-2 at 81-82, R. 80-81). The vocational expert determined that such an individual was not capable of performing his past work, but could perform other jobs available nationally. (Id. at 82-83, R. 81-82). The second hypothetical provided that the vocational expert should assume an individual that:

> [W]ould rarely lift and carry ten pounds; stand or walk less than two hours in a day; sit less than two hours a day; less than occasional handling and fingering bilaterally; no exposure to pulmonary irritants including dust, fumes, odors, and gases; no exposure to unprotected heights or hazardous machinery; and unscheduled absence of four or more days a month.

(Id. at 83, R. 82). In response to the second hypothetical, the vocational expert determined that no competitive employment existed for an individual with the described combination of limitations. (Id. at 84, R. 83).

In assessing Frederick's RFC, the ALJ concluded that Frederick retained the RFC to perform light work with certain limitations. (Dkt. 5-2 at 20, R. 19). These limitations mirrored the ALJ's first hypothetical, and included: lifting and carrying twenty pounds occasionally and ten pounds frequently; unlimited pushing and pulling except for weights indicated; standing or walking for up to six hours in an eight hour workday; sitting for up to six hours in an eight hour workday; occasionally climbing ramp or stairs; occasionally climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and occasional overhead reaching with the right upper extremity. (Dkt. 5-2 at 21, R. 20).

In so finding, the ALJ stated that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," along with opinion evidence. (Dkt. 5-2 at 21, R. 20).

The ALJ explained that the limitations he assessed were to accommodate Frederick's degenerative disc disease of the cervical and lumbar spine, arthritis, bilateral inguinal hernias, and diabetes impairments. (Dkt. 5-2 at 28, R. 27). Further, the ALJ noted, the postural restrictions were included to accommodate the aforementioned impairments, with an added limitation of occasional overhead reaching, which took into account Frederick's right shoulder impairment. (Dkt. 5-2 at 28, R. 27). The ALJ then discussed the medical evidence related to Frederick's degenerative disc disease and medical history related to his back impairments. This review included details regarding Frederick's MRI findings of facet arthritis; central stenosis; multi-level spondylosis; and nerve root compression. (Dkt. 5-2 at 23-25, R. 22-24). The ALJ noted Frederick's pain management with medication and treatment with cortisone injections, medial branch blocks, physical therapy, and a back brace. (Dkt. 5-2 at 24, R. 23). Further, as discussed above, the ALJ listed Frederick's report of daily activities and mentioned NP Spearing's opinion.

Although the ALJ may have articulated some reasoning behind his RFC assessment as required by SSR 96-8p, the Undersigned declines to recommend that the ALJ's RFC determination and the hypothetical posed to the vocational expert be affirmed. As stated previously, the Court should remand this matter in order for the

ALJ to re-evaluate Frederick's subjective symptom allegations and properly assess NP Spearing's opinion. In doing so, the ALJ may change his conclusion related to Frederick's subjective symptoms or NP Spearing's opinion, both of which must be incorporated into the ALJ's RFC analysis and hypothetical posed to the vocational expert. *See Dykes v. Astrue*, No. 1:12-cv-00370-MJD-RLY, 2013 WL 125164, at *8 (S.D. Ind. Jan. 8, 2013) (finding that because the ALJ erred in her credibility determination, the ALJ must re-evaluate credibility and incorporate any changes in the RFC analysis and hypothetical questions to the vocational expert).

Without a proper analysis of Frederick's subjective symptoms and NP Spearing's opinion by the ALJ, the Undersigned cannot determine whether the ALJ's reasoning behind his RFC assessment is sound and, in turn, whether the hypothetical posed to the vocational expert properly incorporated all of Frederick's limitations. As such, the Undersigned cannot recommend that this issue be affirmed.

## VI. CONCLUSION

For the reasons detailed herein, the Undersigned recommends that the Court **REVERSE** the ALJ's decision denying Plaintiff benefits and **REMAND** the matter for further proceedings.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1). Failure to timely file objections within fourteen days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure. Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

So ORDERED.


Date: 9/9/2020


Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana


Distribution:

All ECF-registered counsel of record via email.